IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EDWARD G. WILLIAMS,              :
                                 :
          Plaintiff,             :
                                 :
     v.                          : Civ. Action No. 07-637-JJF
                                 :
CORRECTIONAL MEDICAL SERVICES,:
et al.,                          :
                                 :
          Defendants.            :

---

Edward G. Williams, <u>Pro</u> <u>se</u> Plaintiff, James T. Vaughn
Correctional Center, Smyrna, Delaware.

James Edward Drnec, Esquire, Balick & Balick, LLC, Wilmington,
Delaware.  Attorney for Defendants Correctional Medical Services
and Sherell Ott.

Catherine C. Damavandi, Esquire, Deputy Attorney General,
Delaware Department of Justice.  Attorney for Defendants
Commissioner Carl Danberg, Warden Thomas Carroll, and Attorney
General Beau Biden.

---

**MEMORANDUM OPINION**

June 24, 2009
Wilmington, Delaware

Joseph J. Farnan Jr.
Farnan, District Judge

Plaintiff Edward G. Williams ("Plaintiff"), an inmate currently incarcerated at the James T. Vaughn Correctional Center ("VCC") filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging deliberate indifference to serious medical needs. Plaintiff proceeds pro se and has been granted leave to proceed in forma pauperis. Presently before the Court are several Motions filed by the parties, including Motions For Summary Judgment and Motions To Amend the Complaint. (D.I. 45, 50, 64, 73, 86, 88, 93.) For the reasons discussed below, the Court will deny Ott's Motion To Dismiss as moot, will grant Defendants' Motion For Summary Judgment as to Ott, will grant in part and deny in part Defendants' Motion For Summary Judgment as to CMS, will deny Plaintiff's Motion For Summary Judgment, will grant Plaintiff's Requests For Counsel, and will deny Plaintiff's remaining Motions.

## I. BACKGROUND

The following facts are taken from the Complaint and other documents and exhibits submitted by the parties. The Court dismissed several Defendants and claims following its initial screening of the Complaint. (D.I. 9, 10.) The remaining Defendants are Correctional Medical Services ("CMS"), First

1

Correctional Medical ("FCM")[1], Commissioner Carl Danberg

("Danberg"), Warden Thomas Carroll ("Carroll"), Attorney General

of the State of Delaware Beau Biden ("Biden"), Old Correctional

Services ("OCS")[2], and Sherell Ott ("Ott")[3].  The Complaint

alleges that Plaintiff was evaluated by Dr. Levente Szalai ("Dr.

Szalai") on October 17, 2005, for daily pain, constipation,

bloody bowel movements, hemorrhoids, abdominal hernia pain, and

that Dr. Szalai recommended an immediate colonoscopy and an

abdominal hernia repair.  (D.I. 2, ¶ IV.)  As of the date he

filed his Complaint, October 9, 2007, Plaintiff had yet to

undergo the recommended colonoscopy or abdominal hernia repair

surgery.[4]  Plaintiff alleges deliberate indifference to his

---

[1]FCM has not been served.  (See D.I. 69.)

[2]OCM has not been served.  (See D.I. 25.)

[3]Ott is incorrectly named as Dr. Ott.  The record indicates
that Sherell Ott is a nurse practitioner, not a physician.  Ott
was not formally served.  The record reflects, however, that
counsel accepted service accepted on her behalf.  (D.I. 30.)

[4]The computation of time for complaints filed by pro se
inmates is determined according to the "mailbox rule."  In
Houston v. Lack, 487 U.S. 266 (1988), the United States Supreme
Court held that a prisoner's notice of appeal of a habeas corpus
petition was deemed filed as of the date it was delivered to
prison officials for mailing to the court.  While Houston dealt
specifically with the filing of a habeas appeal, the decision has
been extended by the Court of Appeals for the Third Circuit to
other prisoner filings.  See Burns v. Morton, 134 F.3d 109, 112
(3d Cir. 1998).  Additionally, this District has extended the
Houston mailbox rule to pro se § 1983 complaints.  Gibbs v.
Decker, 234 F. Supp. 2d 458, 463 (D. Del. 2002).

serious medical needs.

Medical records indicate that on August 3, 2005, Ott examined Plaintiff and ordered an abdominal ultrasound, a surgical consult, and an abdominal binder.[5]   (D.I. 35, D76; D.I. 66, A1; D.I. 85, D164.)   The response to her request for an abdominal ultrasound, dated August 22, 2005, states, "per RMD, Dr. Hellander - a nonreducible hernia is [at] risk for strangulation - need to move forward [with] repair."   (Id.)

A lower abdominal sonogram was performed on November 5, 2005.   (D.I. 72, D71.)   The sonogram revealed normal nondistended bowel loops with positive peristalsis beneath the abdominal wall

---

Plaintiff's Complaint was signed on October 9, 2007, and the envelope it was mailed in is post-marked October 13, 2007. Therefore, Plaintiff's Complaint was delivered to prison authorities for mailing some time between October 9, 2007 and October 13, 2007.   Giving Plaintiff the benefit, the Court concludes that Plaintiff's Complaint was filed on October 9, 2007, the date it was signed, and the earliest date possible that it could have been delivered to prison officials in Delaware for mailing.

[5]Defendants state that Plaintiff's chart contains almost no medical records prior to 2006, with the earliest progress note dated December 16, 2006, since the prior medical vendor left on less than amicable conditions.   (D.I. 65 n.1.)   The Court takes judicial notice that FCM provided contract medical services to Delaware prisons from July 1, 2002 through June 30, 2005. Francisco v. Correctional Med. Sys., Civ. No. 03-499-JJF, 2007 WL 896190, at *1 (D. Del. Mar. 22, 2007).   CMS began providing medical services to Delaware prisons on July 1, 2005 and, at present, is the contract medical service provider.   Francisco v. Correctional Med. Sys., 548 F. Supp. 2d 128, n.2 (D. Del. 2008). The Court has scoured the record and discovered that it contains a few of Plaintiff's medical records from 2005 and 2006.

corresponding to clinically palpable lump.  (Id.)  The report

indicates that it was radiographically difficult to rule out a

recurrent hernia and that a CT scan should be considered.  (Id.)

Plaintiff submitted a medical grievance dated November 17,

2006, inquiring whether he had been approved for a colonoscopy.[6]

(D.I. 77.)  The grievance states that when Plaintiff inquired at

medical he was told by the doctor (presumably Ott, incorrectly

---

[6]Plaintiff requested medical care for his abdominal
condition in 2006 on November 14, 20, and 30; and December 12; in
2007 on January 15, 16, 22, and 26; February 8; April 6; June 20,
23, 26, 27, and 30; July 2, 3, 4, and 9; August 28; October 20,
22, and 28; November 19 and 20; and December 14, 16, 20, and 30;
in 2008 on January 1, 8, 24, and 27; February 4 and 20; March 10
and 22; April 17; May 5 and 27; June 30; July 27; August 25;
October 15, 19; November 18; and December 18 and 27.  (D.I. 35,
D138-141; D.I. 66, A8, A11-13, A15, A23, A29-37, A45, A49-51,
A56, A59, A66-68, A71-74, A79-80, A83-85, A87, A90, A95, A97-98,
A102, A104, A106; A111-112, A122, A125-126.)

Plaintiff submitted grievances in an effort to obtain
medical treatment for his abdominal condition.  On January 15,
2007, he complained that he had been approved for surgery a year
earlier, "but someone marked [his] serious medical condition down
as non-medical."  (D.I. 56, ex.)  Medical grievances for his
abdominal condition were also submitted on January 19, 2007,
April 16, 2007, and June 26, 2008.  (Id.)

CMS progress notes indicate Plaintiff was seen by CMS
medical personnel in 2005 on May 23; August 3; and November 2; in
2006 on January 10; and December 5 and 20; in 2007 on February
14; March 13; April 19; May 10; July 12, 17, 24; August 30;
September 19; October 27; November 20; and December 6, 8, 10, 11,
12, 13, and 20; in 2008 on January 7, 11, 19, and 30; February
28; March 17;  April 8, 15, and 16; August 9; September 3,
November 9, 10, 11, 12, 13, 14, and 20; and December 21 and 29
(D.I. 35, D142, D146, D156, D162-165; D.I. 66, A16, A21, A26,
A38, A40, A46, A48-49, A57, A60, A63, A69, A73-A75, A81, A92,
A94, A99, A107, A113, A118, A123-125, A127; D. I. 85, D147.)

identified as a physician) that she thought Plaintiff had been transferred to Georgetown, but Plaintiff did not receive as answer to his question. (Id.) The grievance was sent to medical on December 1, 2006. (Id.) As a result, Plaintiff was scheduled to see Dr. Frederick VanDusen ("Dr. VanDusen") on December 5, 2006. (D.I. 56, ex.) At that time Dr. VanDusen submitted a request for a surgical consult regarding Plaintiff's complex ventral hernia condition. (D.I. 72, D75.) The request states that "the surgery was already approved by prior reviewing MD in August 2005 and never followed up!" (D.I. 72, D75.) Plaintiff submitted a request for medical care, including surgery, on December 12, 2006, and he was told that the "urgent surgery [was] being worked on." (D.I. 35, D138.) During his December 20, 2006 medical appointment, Plaintiff was advised that surgery was approved, but he was not provided the date for security reasons. (D.I. 36, D162.)

Plaintiff was seen by Dr. Szalai on March 1, 2007, and presented with a large, incisional, abdominal wall ventral hernia, and frequent bloody bowel movements. (D.I. 54, at 2.) At the time, Dr. Szalai recommended a colonoscopy and ventral hernia repair. (Id.) On March 5, 2007, Dr. VanDusen requested a CT scan of the abdomen and pelvis for evaluation prior to surgery and a colonoscopy, and although not approved, he ordered the

same.  (D.I. 35, D70.)  On March 27, 2007, Dr. VanDusen submitted a consultation request for a colonoscopy.  (Id. at D72; D.I. 66, A18-19, A22.)  The March 5, 2007 colonoscopy was either approved on May 10, 2007 or May 14, 2007; there are two different versions of the approval.  (D.I. 35, D73; D.I. 66, A19.)  The May 10th version states "5-23 @ 6:00."  (D.I. 35 at D73.)  The May 14th version states "per Dr. [illegible] suggest do colonoscopy first. If that's OK, then re-submit for CT. OK; [illegible] 6-21 @ 9:00; Surgeon requests CT abdomen & pelvis first F✓; done 6/21/07 (See report)."  (D.I. 66, A19.)

Plaintiff submitted a grievance on April 16, 2007, seeking medical attention and complaining that he had not received the previously approved surgery and colonoscopy.  (D.I. 56, ex. grievance no. 110563 at 1.)  During the grievance process it was noted that Plaintiff had seen Ott on April 19, 2007, that on May 9, 2007, Dr. VanDusen ordered a CT scan of the abdomen and pelvis, and that as of May 23, 2007 the CT scan and colonoscopy were approved and scheduled.  (Id. at 4.)

An abdominal CT scan performed on June 21, 2007, revealed a ventral hernia containing bile, with no inflammatory changes. (D.I. 43, at 4.)  Another CT scan of the abdomen and pelvis was performed on August 8, 2007.  (D.I. 54, at 12; D.I. 66, A41-42.) The initial report, dated August 8, 2007, was followed by an

addendum, dated August 9, 2007. It reported (1) evidence of previous anterior abdominal wall surgery with thinning of the anterior abdominal wall and small hernias and (2) a fluid-filled, mildly dilated structure, which had the appearance of an anastomotic bowel loop. (Id.)

On July 12, 2007, Dr. McFull submitted a request for Plaintiff to undergo a colonoscopy, noting that Plaintiff had seen Dr. Szalai on May 1, 2007, a CT scan was performed on June 21, 2007, and a colonoscopy "needs to be done." (D.I. 66, A39.)

Plaintiff returned to Dr. Szalai for consultation on August 17, 2007, for the ventral hernia detected by the August 8, 2007 CT scan. (D.I. 66, A2.) Dr. Szalai recommended surgical repair but, before proceeding, recommended that Plaintiff undergo a colonoscopy. (Id. at A3-4.) A CMS "off-site return progress note" dated August 17, 2007, notes the recommendation of Dr. Szalai as follows: "colonoscopy needed and hernia repair. 3rd time seeing this for same problem please have MD order the above." (D.I. 85, D52.)

On August 20, 2007, Dr. VanDusen submitted a consultation request for Plaintiff to undergo a colonoscopy, noting that the procedure was recommended by the surgeon prior to ventral abdominal hernia repair. (D.I. 54 at 11.) The request also noted that the criteria for the colonoscopy had been met in

7

March, and it continued to be met. (Id.) On August 24, 2007, Dr. VanDusen requested a consult for general surgery and noting that "a referral for colonoscopy was written (again)." (Id. at D53.)

Plaintiff filed his lawsuit on October 9, 2007. (D.I. 2.) At that time, neither the recommended colonoscopy nor the surgery had taken place.

Plaintiff next saw Dr. Szalai for a consultation on November 2, 2007. (D.I. 54.) Dr. Szalai's report, of the same date, states that he had seen Plaintiff two years earlier for the same problem: a large, incisional abdominal wall ventral hernia and complaints of frequent bloody bowel movements. (Id.) When Dr. Szalai had seen Plaintiff initially, he recommended a colonoscopy and subsequent ventral hernia repair, but Plaintiff was not returned to Dr. Szalai for the procedures. (Id. at 1.) Dr. Szalai saw Plaintiff on March 1, 2007, and August 17, 2007, for the same problems and made the same recommendations. (Id. at 1, 8-10.)

Dr. Szalai took note of a CT scan performed on Plaintiff on August 8, 2007. (D.I. 54 at 2, 5-7.) The CT scan revealed a 9.8 cm ventral hernia with slight protrusion of the transverse colon through the hernia defect. (Id.) After conducting a physical examination of Plaintiff, Dr. Szalai personally reviewed the CT

8

scan film and noted that (1) Plaintiff seemed to have had a
right-sided rectus muscle tear in the distant past, and (2) Dr.
Szalai did not distinctly see a hernia defect but what seemed to
be more of a laxity of the muscle of the anterior abdominal wall.
(Id.)  Dr. Szalai discussed his findings with a radiologist, who
agreed with him.  (Id.)  In light of the physical examination and
his careful review of the CT scan, Dr. Szalai was not certain
that a ventral hernia repair would be helpful in relieving
Plaintiff's occasional abdominal pain symptoms.  (Id. at 3.)  He
noted that because of Plaintiff's many past abdominal operations,
the risk of surgery was fairly high, and questioned whether it
would outweigh the benefits of such a procedure.  (Id.)  Dr.
Szalai recommended that Plaintiff undergo a colonoscopy first and
then possibly a diagnostic laparoscopy.  (Id.)

On November 12, 2007, Dr. VanDusen submitted yet another
request for Plaintiff to undergo a colonoscopy.  (D.I. 66, A55.)
His request states, "this recommendation is 2 yrs old!"  (Id.)  A
letter authored by Dr. Szalai to Dr. VanDusen, and dated December
10, 2007, indicates that the colonoscopy was performed on
December 10, 2007.[7]  (D.I. 54 at 13.)  Dr. Szalai noted that

_____

[7]CMS infirmary admission notes dated December 10 and 11,
2007, state that Plaintiff's "old record not found," presumably
referring to his medical chart  (D.I. 35, D109-110.)

9

other than small hemorrhoids, the colonoscopy was normal.  (Id.)
Dr. Szalai discussed his findings with Plaintiff during a January
16, 2008 follow-up appointment.  (Id. at 14.)  His report finds
that "because of [Plaintiff's] multiple prior abdominal
operations, any further operation would carry a significant
risk."  (Id. at 15.)  Plaintiff was scheduled for a three-month
follow-up.  (Id.; D.I. 66, A70.)

On February 28, 2008, Dr. VanDusen submitted a request for a
diagnostic laparoscopy.  (D.I. 66, A86.)  Plaintiff returned for
a follow-up appointment on March 28, 2008.  (D.I. 54 at 19.)
Examination indicated that Plaintiff did not have a distinct
hernia defect, but a laxity of the abdominal wall muscle.  (Id.)
Dr. Szalai stated that he did not believe that surgery would be
helpful in terms of Plaintiff's symptoms, and he did not believe
that Plaintiff had a surgical problem.  (Id.)

On April 18, 2008 a request was made for Plaintiff to see a
gastroenterologist.  (D.I. 66, A93.)  The request was deferred.
(Id.)

Plaintiff was seen for a consultation on July 1, 2008, by
Dr. Caruso who recommended a colonoscopy as soon as possible.
(Id. at A103.)  On September 3, 2008, a request was submitted for
Plaintiff to undergo a EGD (ie., esophagogastroduodenoscopy).
(Id. at A109.)  Diagnostic testing on October 3, 2008, indicated

constipation; no apparent bowel obstruction or free air; post-surgical changes with a bullet fragment seen at the left paraspinal area at the L4-L5 level; bony densities seen at the lateral aspect of the left hemi pelvis of uncertain etiology. (Id. at A110.)

Plaintiff presented on November 10, 2008, for an outpatient EGD. (D.I. 51.) Impressions noted a Barrett's esophagus with biopsy taken, a hiatus hernia, gastritis with biopsy taken, and a normal duodenum. (Id.) Plaintiff underwent a colonoscopy on November 13, 2008, and it revealed internal hemorrhoids. (Id.)

On January 30, 2009, Plaintiff returned to Dr. Szalai for follow-up with symptoms of chronic, intermittent abdominal pain, frequent bright red blood per rectum with every bowel movement, and a history of internal hemorrhoids. (D.I. 80, A1.) Examination revealed laxity of the abdominal wall muscle, rather than a true hernia and stage III, large, frequently bleeding internal hemorrhoids. (Id. at A2.) Dr. Szalai reiterated his opinion that surgery was not required because he did not believe Plaintiff had a hernia, but opined that a repeat CT scan and second surgical opinion might be worthwhile. (Id.) With regard to his hemorrhoids, Dr. Szalai recommended certain steps to avoid straining and felt that Plaintiff would benefit from a hemorrhoidectomy procedure. (Id. at A3.)

11

On February 16, 2009, Dr. Desrosiers submitted a request for a CT scan of the abdomen and pelvis as recommended by Dr. Szalai. (Id. at A4.)  The CT scan, performed on March 13, 2009, revealed findings consistent with small Richter's hernias, with no associated bowel wall thickening or inflammation to suggest strangulation incarceration, no evidence of small bowel obstruction, and a small intraperitoneal fat containing midline ventral hernia.  (D.I. 91, A6-A7.)  On March 18, 2009, a surgical consultation request was submitted for Plaintiff to once against see Dr. Szalai for his abdominal hernias.  (Id. at A8.) Plaintiff was seen by Dr. Desrosiers on March 24, 2009, and they discussed a plan for Plaintiff to return to Dr. Szalai for follow-up surgery.  (Id. at A9.)  Plaintiff indicated that he wished to undergo the surgical repair.  (Id. at A1.)

## II.   STANDARD OF LAW

Plaintiff and Defendants CMS and Ott (collectively "Defendants") move for summary judgment.  (D.I. 50, 64.)  The Court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no

12

genuine issue of material fact exists. See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).

When determining whether a genuine issue of material fact
exists, the Court must view the evidence in the light most
favorable to the nonmoving party and draw all reasonable
inferences in that party's favor. Wishkin v. Potter, 476 F.3d
180, 184 (3d Cir. 2007). "Facts that could alter the outcome are
'material,' and disputes are 'genuine' if evidence exists from
which a rational person could conclude that the position of the
person with the burden of proof on the disputed issue is
correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d
300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material
fact, the nonmoving party then "must come forward with 'specific
facts showing that there is a genuine issue for trial.'"
Matsushita Elec. Indus. Co., 475 U.S. at 587 (quoting Fed. R.
Civ. P. 56(e)). If the nonmoving party fails to make a
sufficient showing on an essential element of its case with
respect to which it has the burden of proof, the moving party is
entitled to judgment as a matter of law. See Celotex Corp. v.
Catrett, 477 U.S. 317, 322 (1986).

## III.  DISCUSSION

### A.  Medical Needs

Plaintiff moves for summary judgment and for a meeting with
Defendants to discuss settlement on the grounds that Defendants
purposely denied and delayed his abdominal hernia repair surgery
as ordered by physicians from 2005 up through 2009.[8]  (D.I. 50.)
He argues that CMS did not approve the surgery and that Ott
purposefully delayed all physician's hernia surgery repair orders
by transferring Plaintiff's medical records to Sussex
Correctional Institution ("SCI"), Georgetown, Delaware.  Only
Defendant CMS filed an Opposition to Plaintiff's Motion for
Summary Judgment.  (D.I 52.)

Defendants also move for summary judgment and argue that
Plaintiff's Motion must be denied, first noting that Plaintiff
cannot rely upon the doctrine of respondeat superior to support
his claims.  (D.I. 64.)  Second, they argue that while
Plaintiff's claims rest upon a recommendation that he undergo
hernia repair surgery, the opinion was based upon a misdiagnosis,
since corrected by Dr. Szalai who had recommended the surgery.

---

[8]It is not clear if Plaintiff seeks summary judgment against
all Defendants or only against CMS and Ott.  The filing seems to
indicate the Motion is directed to the medical Defendants.
Hence, the Court will discuss the Motion as to the claims only
raised against the Medical Defendants; CMS and Ott.

14

CMS notes that Dr. Szalai now opines that an attempt at a surgical repair would be more risky than beneficial.  It posits that it is entitled to summary judgment because Plaintiff has received treatment for his complaints and he seeks a surgical solution that is not medically necessary.  Ott contends she is entitled to summary judgment as she was executing her duties when she sent Plaintiff's medical chart to a different institution.

When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).  Plaintiff alleges Defendants violated his Eighth Amendment rights by their deliberate indifference to his serious medical needs.

## 1.  Defendant Ott

The government has an "obligation to provide medical care for those whom it is punishing by incarceration."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To prevail in a medical case, Plaintiff must have a serious medical need and prison officials' acts or omissions must indicate deliberate indifference to that need.  Id.  A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Deliberate indifference may

be manifested by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed ." Estelle, 429 U.S. at 104-05. Mere negligence does not violate the Eighth Amendment. Id. at 106. Additionally, "mere disagreement as to the proper medical treatment" is insufficient to establish an Eighth Amendment violation. Monmouth County Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) (citations omitted). The Third Circuit has specifically found deliberate indifference when: (1) a prison official knows of the prisoner's need for treatment but intentionally refuses to provide it; (2) the prison official delays necessary medical treatment for non-medical reasons; or (3) the prison official prevents a prisoner from receiving needed or recommended treatment. Rouse v. Plaintier, 182 F.3d 192, 197 (3d Cir. 1999) (citations omitted).

Plaintiff claims that Ott purposefully transferred his medical records to a different institution to delay his medical treatment. Plaintiff, however, provides no evidence to support his claim that Ott acted in a willful manner to delay medical treatment. The medical records indicate that it was Ott who first ordered an abdominal ultrasound and surgical consultation in August 2005. Three months later, a lower abdominal sonogram was performed. When Plaintiff inquired about his delay in

treatment he was told by Ott that she thought he had been transferred. He infers from this comment that his records were intentionally transferred.

Based upon the facts before the Court, a reasonable jury could not find that Ott's alleged mistaken belief that Plaintiff was transferred to a different correctional institution constitutes deliberate indifference to a serious medical need. If in fact Plaintiff's delay in medical care resulted from a mistaken transfer of his medical records, while regrettable, the record does not otherwise support a finding that Ott ignored Plaintiff's medical conditions. Rather, Ott provided Plaintiff with medical care, requested additional diagnostic tests, and sought approval for surgery.

With regard to Ott, there are no genuine issues for trial. For the above reasons, the Court will grant Defendants' Motion For Summary Judgment as to Ott and will deny Plaintiff's Motion for Summary Judgment as to Ott.[9] (D.I. 50, 64.)

## 2. Defendant CMS

Plaintiff claims that CMS' delay of recommended medical testing and surgery has caused him to experience physical pain and suffering, as well as mental, emotional, and psychological

_____

[9]Ott also filed a Motion To Dismiss. (D.I. 45.) The Court will deny the Motion as moot.

fear of losing his life. In order to establish that CMS is directly liable for the alleged constitutional violations, Plaintiff "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [he] allege[s]." Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories).

Assuming the acts of CMS' employee have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. See Natale, 318 F.3d at 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" Miller v. Correctional Med. Sys., Inc., 802 F. Supp. 1126, 1132 (D. Del. 1992) (alteration in original) (quoting Andrews v. City of

18

Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Id. (citing Andrews, 895 F.2d at 1480; Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989)).

Policies that subject prisoners to pain that serve no penological purpose are unconstitutional. See Estelle, 429 U.S. at 103. "[T]he Estelle test gives substantial latitude to prison medical authorities to diagnose and treat inmates patients, but '[i]mplicit in this deference to . . . is the assumption that such an informed judgment has, in fact been made. . . .'" Young v. Kazmerski, 266 F. App'x 191, 194 (3d Cir. 2008) (citations omitted) (not reported); see Monmouth, 834 F.2d at 346 ("Short of absolute denial, if necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (internal quotation and citation omitted.)

With respect to CMS, there can be no doubt that Plaintiff has proven a serious medical need. Plaintiff has a number of medical conditions, including bloody bowel movements and diagnoses of abdominal hernias. The question that remains is whether there are genuine issues of material fact that relate to the second prong of the Estelle test. Put simply, whether CMS

19

was "deliberately indifferent" to Plaintiff's serious medical needs.

CMS argues that based upon the medical records, it, not Plaintiff, is entitled to summary judgment, as it has provided Plaintiff ongoing treatment, even if not the treatment he desires.  Defendants claim that the ventral abdominal wall hernia never existed and Plaintiff's claimed serious medical problem was the result of a misdiagnosis with a medical expert closely reviewing the evidence and reaching a different conclusion. Defendants posit that while Plaintiff may argue he states a claim for deliberate indifference from October 2005 to November 2007 based upon CMS's failure to follow Dr. Szalai's instructions, his constitutional rights cannot be violated where he is not given treatment for a condition (i.e., ventral wall hernia) that he does not have.  CMS further argues that subsequent to November 2, 2007, neither Dr. Szalai nor Dr. Caruso have recommended treatment different than that provided by CMS.  Finally, Defendants contend that Plaintiff has no claim for damages even if there was deliberate indifference by failing to provide a surgical remedy for a non-existent hernia as there is no difference in the outcome with or without the surgery.

Plaintiff contends that he is entitled to summary judgment since it is clear from the record that as early as October 2005

physicians recommended diagnostic testing, including a colonoscopy, as well as surgery, but CMS failed to provide him the recommended treatment. Plaintiff notes that the recommendation that he undergo a colonoscopy was two years old, and it was only after he filed this lawsuit that it was performed. Similarly, a CT scan ordered in November 2005, was not conducted until more than two years later. Finally, he notes that Defendants overlook the fact that hernia surgery was ordered in 2005 up until the time he filed this lawsuit.

It appears from the record that there may be a policy of delay or denial of recommended medical care. Although CMS personnel have provided, and continue to provide, Plaintiff with medical care, the care seems to have increased subsequent to Plaintiff's filing this lawsuit. The Court's discomfort with the record lies with the objective evidence that well before Dr. Szalai changed his medical opinion and subsequent to the filing of this lawsuit in October 2007: (1) hernia surgery was approved as of August 22, 2005, but it did not take place; (2) hernia surgery was approved a second time on December 20, 2006, but it did not place; (3) a colonoscopy and hernia surgery were recommended by Dr. Szalai on March 1, 2007, but they did not take place; (4) a colonoscopy and hernia surgery were recommended by Dr. Szalai on August 17, 2007, but they did not take place; (5)

21

Plaintiff had frequent bloody stools and a colonoscopy was requested on August 3, 2005, March 5, 2007, May 10, 2007, July 12, 2007, August 20, 2007, August 24, 2007, and November 12, 2007, but it did not take place until December 10, 2007 - two months after Plaintiff filed this lawsuit; (6) at least two of Dr. VanDusen's requests for a colonoscopy indicated Plaintiff had met the prior criteria and/or he was requesting it "again"; (7) Dr. VanDusen's December 5, 2006 request for surgery pointedly stated that there had been prior approval with no follow-up and the statement ended with an explanation point; (8) Dr. McFull's July 12, 2007 request for a colonoscopy stated that it needed to be done; (9) medical records state on numerous occasions that a colonoscopy was required before surgery could be performed; (10) when Plaintiff saw Dr. Szalai in November 2007, Dr. Szalai noted that he had recommended a colonoscopy and surgery two years earlier, but Plaintiff was never returned to see him; and (11) Dr. VanDusen's November 12, 2007, request for a colonoscopy stated "this recommendation is 2 yrs. old" followed by an explanation point.

The delay in providing Plaintiff the colonoscopy, from the time it was first medically determined that it was necessary, until it was finally performed a few months after the filing of this lawsuit, raises concerns of a constitutional dimension.

22

Moreover, at the time this lawsuit was filed, hernia surgery was recommended and approved at least twice, but it was not performed. It was not until after Plaintiff filed this lawsuit that Dr. Szalai's medical opinion changed. Defendants' rely upon the change of diagnosis by Dr. Szalai and posit that because Plaintiff does not have a medical condition requiring surgery, summary judgment is appropriate for CMS. Defendants' position is no longer borne by the record. Diagnostic testing once again indicates that Plaintiff has a midline ventral hernia and surgery, it seems, is indicated. Moreover, Defendants fail to explain why Plaintiff was not provided with a colonoscopy when all physicians repeatedly requested one. Nor do Defendants explain why surgery was not performed prior to the filing of the Complaint, even though it was approved on two occasions. As it now stands, the record leaves unexplained answers to why there was such a delay in providing the diagnostic testing and surgery Plaintiff required. Inasmuch as there remain genuine issues of material facts, the Court will deny Defendants' Motion For Summary Judgment as to CMS and will also deny Plaintiff's Motion For Summary Judgment.

## B. Medical Negligence

Defendants move for summary judgment on potential medical negligence claims on the grounds that Plaintiff failed to file an

affidavit of merit as required by Del. Code Ann., tit. 18 § 6853.
In Delaware, medical malpractice is governed by the Delaware
Health Care Negligence Insurance and Litigation Act. Del. Code
Ann., tit. 18 §§ 6801-6865. When a party alleges medical
negligence, Delaware law requires the party to produce an
affidavit of merit with expert medical testimony detailing: (1)
the applicable standard of care, (2) the alleged deviation from
that standard, and (3) the causal link between the deviation and
the alleged injury. Bonesmo v. Nemours Foundation, 253 F. Supp.
2d 801, 804 (D. Del. 2003) (quoting Green v. Weiner, 766 A.2d
492, 494-95 (Del. 2001)) (internal quotations omitted); Del. Code
Ann., tit. 18 § 6853.

At the time the Complaint was filed Plaintiff was required
to submit an affidavit of merit signed by an expert witness as to
each Defendant he alleges were medically negligent. Del. Code
Ann., tit. 18 § 6853(a)(1). Plaintiff, however, failed to
accompany the Complaint with an affidavit of merit as required by
Del. Code Ann., tit. 18 § 6853(a)(1). For the above reasons, the
Court will grant Defendants' Motion For Summary Judgment as to
the medical negligence claims.

## IV. MISCELLANEOUS MOTIONS

### A. Motion For Preliminary Injunction

Plaintiff recently filed a Motion For Injunction[10] seeking abdominal surgery to repair his recently re-diagnosed midline ventral hernia and hemorrhoids, as well as a settlement conference. (D.I. 88.)  Defendants oppose the Motion on the grounds that Plaintiff cannot meet his burden to show the likelihood of success on the merits or irreparable harm.  (D.I. 90.)

A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004)(citation omitted).  "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'"  Id.  (citations omitted).

CMS argues that injunctive relief is not warranted as

---

[10]The Motion is entitled "Motion For Injunction, For Meeting, For Amendment & Motion For Summary Judgment."  The Court will address the injunctive relief and settlement conference issues.  The amendment and summary judgment issues are discussed elsewhere in this Memorandum Opinion.

Plaintiff's medical care continues.  CMS notes that subsequent to the most recent CT scan report, Plaintiff is scheduled to see Dr. Szalai but the date cannot be disclosed for security reasons. Additionally, Dr. Desrosiers continues to treat Plaintiff.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable.  Harrison v. Barkley, 219 F.3d 132, 138-140 (2d Cir. 2000).  An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. Estelle v. Gamble, 429 U.S. 97, 107 (1976).  Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation.  See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

It appears that Plaintiff's medical continues.  It also appears that once again hernia repair surgery is a possibility. As the record now stands, Plaintiff has not demonstrated the likelihood of success on the merits.  Nor do the medical records before the Court indicate that, at the present time, Plaintiff is in danger of suffering irreparable harm.  Of course, the Court was not provided with medical records subsequent to March 24,

26

2009.  For these reasons, the Court will deny the Motion.

Defendants are placed on notice that should hernia repair surgery be medically necessary, the Court will not hesitate to order injunctive relief once it becomes aware that Plaintiff is in danger of suffering irreparable harm, particularly in light of medical records that reflect hernia repair surgery was authorized four year ago, in August 2005.

The Court will deny the request for a settlement conference. The Court will order mediation if it deems it appropriate.

For the above reasons, the Court will deny the Motion For Injunction.  (D.I. 88.)

## B.  Request For Counsel

Plaintiff has filed Motions For Appointment Of Counsel.[11] (D.I. 86, 93.)  Defendants oppose the Motions.  (D.I. 89.) Although a plaintiff does not have a constitutional or statutory right to an attorney in a civil case, a district court may seek legal representation by counsel for a plaintiff who demonstrates "special circumstances indicating the likelihood of substantial

---

[11]The Motion are entitled Motions To Amend, For Discovery, For Appointment Of Counsel (D.I. 86) and Motion To Amend, Motion Declaration For Entry Of Default, Plaintiff Motion For Discovery & Appointment Of Counsel (D.I. 93).  Plaintiff has moved for discovery in other motions.  At present, there are no Court imposed discovery deadlines.  Hence, his requests are unnecessary.  Additionally, the Request For Entry Of Default is frivolous.

27

prejudice to [the plaintiff] resulting . . . from [the
plaintiff's] probable inability without such assistance to
present the facts and legal issues to the court in a complex but
arguably meritorious case." Tabron v. Grace, 6 F.3d 147, 154 (3d
Cir. 1993)(citing Smith-Bey v. Petsock, 741 F.2d 22, 26 (3d Cir.
1984)). Factors to be considered by a court in deciding whether
to request a lawyer to represent an indigent plaintiff include:
(1) the merits of the plaintiff's claim; (2) the plaintiff's
ability to present his or her case considering his or her
education, literacy, experience, and the restraints placed upon
him or her by incarceration; (3) the complexity of the legal
issues; (4) the degree to which factual investigation is required
and the plaintiff's ability to pursue such investigation; (5) the
plaintiff's capacity to retain counsel on his or her own behalf;
and (5) the degree to which the case turns on credibility
determinations or expert testimony. Montgomery v. Pinchak, 294
F.3d 492, 498-99 (3d Cir. 2002); Tabron, 6 F.3d at 155-56.

Plaintiff did not support his request for an appointed
attorney other than to make a few statements in that regard. Up
to this point, Plaintiff has ably represented himself in this
case. At this juncture, however, his case appears to have
sufficient merit from the standpoint of necessary medical
testimony that it is appropriate to seek counsel for him.
Accordingly, the Court will grant Plaintiff's Requests for

28

Counsel.   (D.I. 86, 93.)

## C.   **Motion To Amend/Correct Complaint**

Plaintiff has filed several Motions To Amend the Complaint.
(D.I. 73, 86, 88, 93.)   It appears that the proposed amendments
are reiterations of recent medical records, reports, and test
results.   There is also a redundancy of claims currently before
the Court.   Additionally, the Motions appear to be responsive to
Defendants' Motion For Summary Judgment

"After amending once or after an answer has been filed, the
plaintiff may amend only with leave of the court or the written
consent of the opposing party, but 'leave shall be freely given
when justice so requires.'"   Shane v. Fauver, 213 F.3d 113, 115
(3d Cir. 2000) (quoting Fed. R. Civ. P. 15(a)).   The proposed
amendments reiterate previously raised claims, and their content
is better described as evidence and/or argument in support of
Plaintiff's claims, rather than amendments to the Complaint.
Therefore, the Court will deny the Motions To Amend.   (D.I. 73,
86, 88, 93.)

## V.   **CONCLUSION**

For the above reasons, the Court will deny Ott's Motion To
Dismiss as moot, will grant Defendants' Motion For Summary
Judgment as to Ott, will grant in part and deny in part
Defendants' Motion For Summary Judgment as to CMS, will deny

29

Plaintiff's Motion For Summary Judgment, will grant Plaintiff's Requests For Counsel, and will deny Plaintiff's remaining Motions.   (D.I. 45, 50, 64, 73, 86, 88, 93.)

An appropriate Order will be entered.